UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Steve St. Juliana, personal representative
of the estate of Hana St. Juliana, deceased,
and Reina St. Juliana, a minor,
by her Next Friend Steve St. Juliana,               Case No.

      Plaintiffs,

                                         U.S. District Judge
                                         U.S. Magistrate Judge

v.

Oxford Community School District,
Timothy Throne, former superintendent,
Nicholas Ejak, Dean of Students,
Shawn Hopkins, Student Counselor,
Kenneth Weaver, Superintendent,
in his official capacity,

      Defendants.

---

MICHAEL L. PITT (P24429)
BETH RIVERS (P33614)
MEGAN BONANNI (P52079)
KEVIN CARLSON (P67704)
DANIELLE CANEPA (P82237)
Pitt, McGehee, Palmer, Bonanni & Rivers PC
Attorneys for Plaintiff
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

1

## COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF AND DAMAGES

## INTRODUCTION

On the morning of November 30, 2021, tenth grader John Doe ("Doe") came to Oxford High School in a suicidal state, posing a clear threat to himself and others. He was armed with a handgun and bullets, which he kept in his backpack. His first hour English teacher reported to school officials that during class he was watching a video depicting a shooting. His second hour math teacher reported to school officials that he had drawn disturbing and violent words and images onto a paper assignment, including: "The thoughts won't stop. Help me . . . blood everywhere . . . My life is useless . . . The world is dead." Doe had demonstrated a disturbing pattern of behavior in the weeks preceding November 30th and in the prior twenty-four hours, including being observed by a teacher searching the internet for information about bullets.

Doe's counselor, Shawn Hopkins, removed Doe from his math class, confiscated the paper containing the violent words and images, and took Doe to the counseling office for a meeting with Dean of Students Nicholas Ejak. Ejak retrieved Doe's backpack from the math classroom and brought it to the Counselor's office, but withheld it from Doe.

Hopkins and Ejak concluded that Doe was suicidal and was exhibiting signs of homicidal ideation. Hopkins and Ejak met with Doe's parents the morning of November 30th and recommended that they take Doe from school and that he receive immediate mental health counseling. When Doe's parents refused to take their son or secure for him immediate mental health counseling, Ejak and Hopkins had the authority to keep Doe in the safety and security of the Counselor's office for the duration of the school day. Instead, Ejak and Hopkins used their authority to write a hall pass, give Doe his backpack (without searching it), and return him to his third hour class, alone.

Less than two hours later, Doe took his backpack into a bathroom and emerged with his loaded handgun. He opened fire, killing four students, including fourteen-year-old Hana St. Juliana, and seriously injuring seven others. Hana's sister, sixteen-year-old Reina St. Juliana, was present in a nearby hallway and survived the shooting.

Oxford Community School District ("District") and its officials have told the families of those students killed or injured that it was adhering to its formal policy of returning students to class unless there is a "disciplinary" issue that could be used to either send them home or hold them in the counseling office. The District claims that since Doe did not present a "disciplinary" issue, it had no choice but to return him to class.

The District has denied knowing that Doe was suicidal and harboring homicidal ideation. In truth, the District did know that Doe was suicidal and possibly homicidal when he was released from the Counselor's office. The District has advanced the "adherence to policy" explanation to cover up its culpability for this tragedy. The truth is that school officials escalated the danger by releasing Doe from a safe zone with knowledge of Doe's propensity to inflict harm upon himself or others. The only relevant inquiry for these school officials was: "if Doe is released, will the danger to himself or his fellow students in the school be increased?" Whether Doe was a disciplinary case was irrelevant to the question of whether he should or should not be released from a safe zone. The "adherence to policy" construct is a false narrative manufactured by school officials to avoid accountability for the death and destruction they caused by their deliberate indifference to Doe's status as a troubled youth who was suicidal and who had expressed homicidal ideation.

These school officials compounded the danger to Doe's fellow students by releasing him from a safe zone with an unsearched backpack that contained the deadly weapon that Doe could, and did in fact, use to carry out his suicidal or homicidal plans.

Steve St. Juliana, the father of Hana St. Juliana and personal representative of her estate, and Hana's sister, Reina St. Juliana, allege that Throne, Wolf, Hopkins

and Ejak affirmatively created and increased the danger of the Oxford High School shooting. Because their conduct "shocks the conscience," these defendants are legally accountable for depriving Hana St. Juliana of her constitutional right not to be deprived of life without due process of law. Steve St. Juliana seeks to recover for the estate those damages as permitted by Michigan's Wrongful Death Statute.

These affirmative acts and resulting injuries were driven by at least two official policies, practices, and customs of the District: (1) Hopkins and Ejak claim to have acted pursuant to the District's official but misguided policy that in the absence of a disciplinary issue, they were required to send Doe back to class, even though they knew he was experiencing suicidal and homicidal ideation, and (2) the District did not train Hopkins and Ejak to hold a student in the Counseling office, or to otherwise restrict a student from returning to the classroom, where the student is experiencing suicidal and homicidal ideation, and where returning the student to the classroom environment would create or increase the danger of deadly violence.

Plaintiff Reina St. Juliana survived the shooting but has suffered irreparable harm. She brings this action against Kenneth Weaver, the current Superintendent of the District, not for damages, but for prospective equitable and injunctive relief to restore her right to a full public education.  This right is protected as a property interest under the Due Process Clause of the Fourteenth Amendment. Reina St. Juliana asks the Court to order Superintendent Weaver to protect her interests by

ordering a root cause analysis of the November 30th incident and to take prospective measures to ensure that the District complies with its constitutional obligations to safeguard the safety of its students, including training its administrators, such as Ejak and Hopkins, not to release suicidal students back into the classroom when there is probable cause to know that doing so will result in deadly violence.

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C §§ 1983 and 1988, and under the statutes and common law of the State of Michigan.

2.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C § 1983.

3.     This Court should exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

4.     Venue is proper pursuant to 28 U.S.C. § 1391(d) because all facts alleged in this Complaint took place in Oakland County, Michigan, and the parties reside in the Eastern District of Michigan.

## PARTIES

5.      Steve St. Juliana is the father of Hana St. Juliana, a fourteen-year-old child who was shot and killed at Oxford High School on November 30, 2021. He brings this action in his capacity as the personal representative of Hana's estate, to redress the wrongful death of his daughter, Hana St. Juliana, pursuant to the Michigan wrongful death act, M.C.L. § 600.2922. Steve St. Juliana is not seeking damages for himself and proceeds here solely as the personal representative of his daughter's estate.

6.      Reina St. Juliana is the sister of Hana St. Juliana and the daughter of Steve St. Juliana. Reina St. Juliana is currently sixteen years old and a junior at Oxford High School. As a student enrolled at Oxford High School in the Oxford Community School District, she has a property interest protected by the Due Process Clause of the Fourteenth Amendment in a full public education, and she has standing to seek prospective equitable and injunctive relief from the School District's conduct to restore that property interest through court-ordered measures to bring Oxford's policies into compliance with the Constitution.

7.      Plaintiffs reside in Oakland County, Michigan.

8.      Defendant Oxford Community School District ("OCSD") is a municipal corporation organized in the Township of Oxford, Michigan. OCSD conducts all operations for Oxford High School, including but not limited to funding,

staffing, training, supervising the staff, counselors, and teachers at Oxford High School, and maintaining the safety and security of school facilities for the education and welfare of OCSD students.

9.     OCSD is being sued pursuant to 42 U.S.C. § 1983 for its official polices, practices, and customs, which were the motivating force and cause-in-fact for the decision to return Doe from the safety and security of the counseling office to the classroom on November 30, 2021.

10.    Defendant Timothy Throne ("Throne") is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Superintendent of the Oxford Community School District. Throne is being sued for gross negligence under state law.

11.    Defendant Steven Wolf ("Wolf") is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Principal of Oxford High School in the Oxford Community School District.  Wolf is being sued for his gross negligence under state law.

12.    Defendant Nicholas Ejak ("Ejak") is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of his employment as Dean of Students of the Oxford Community School District. Ejak is being sued pursuant to 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

13.    Defendant Shawn Hopkins ("Hopkins") is a citizen of the State of Michigan and was acting under the color of state law within the course and scope of her employment as a Counselor at Oxford High School in the Oxford Community School District. Hopkins is being sued pursuant to 42 U.S.C. § 1983 and for gross negligence under state law.

14.    Defendant Ken Weaver ("Weaver") is a citizen of the State of Michigan and is currently the Superintendent of Oxford Community School District. Weaver is sued in his official capacity only. Weaver is being sued pursuant to 42 U.S.C. § 1983 for prospective equitable and injunctive relief because he is the highest-ranking official of Oxford Community School District and is responsible for ensuring the district's compliance with state and federal laws, including the Fourteenth Amendment's Due Process Clause.

## STATEMENT OF FACTS

**A. Maintaining school safety and protecting students from deadly violence is an integral aspect of operating a school district and an integral job function of school administrators.**

15.    From 2009 to 2019, school shootings occurred in over 177 schools in the United States, resulting in 356 deaths.[1]

---

[1] *Ten Years of School Shootings*, CNN (July 2019)
https://www.cnn.com/interactive/2019/07/us/ten-years-of-school-shootings-trnd/.

16.     In 2021, there were 202 incidents of gunfire on school grounds, resulting in 49 deaths and 126 injuries.[2]

17.     It is well established that many shooters in mass shooting events were suicidal before the attack commenced.[3]

18.     A recent study of 134 school shootings and attempted school shootings found that 91% of the shooters were students or former students, 87% were in crisis before the shooting and 80% were suicidal before the attack.[4]

19.     The State of Michigan, in recognition of the risks of school mass shootings and gun violence, has enacted legislation mandating that school districts adopt school safety policies.  This legislation includes the Child Protection Law, MCL 722.621 (1975); Statewide School Safety Information Policy, MCL 380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, MCL 380.1308a (2019); Liaison for school safety commission requirements, MCL 380.1241 (2019); Office of School Safety, MCL 28.681 (2019); Reporting of Crimes on the District's Website, MCL 38.1310a (2000); Student Safety Act, MCL 752.911 (2000); Save Our Students Act, MCL 380.1893 (2020); Searching Student

---

[2] *Gunfire on School Grounds in the United States*, EVERYTOWN RESEARCH & POLICY (2021) https://everytownresearch.org/maps/gunfire-on-school-grounds/.
[3] Maggie Koerth, *Can We Prevent Mass Shootings By Preventing Suicide?* FIVETHIRTYEIGHT (Aug. 22, 2019), https://fivethirtyeight.com/features/can-we-prevent-mass-shootings-by-preventing-suicide/.
[4] *Key Findings: Analyses of School and Workplace Shootings*, THE VIOLENCE PROJECT, (2019 Data) https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

Lockers, MCL 380.1306 (2000); and Student in Possession of a Dangerous Weapon, MCL 380.1313 (1987).

20.     Tragically, gun violence in schools is a foreseeable risk which creates a school official's duty to confront and deescalate known threats of violence at school, including school shootings.

21.     Today, unfortunately, eliminating or minimizing the risk of gun violence in schools is an essential part of the duties of school administrators, teachers, and counselors as a matter of state and federal law.

**B. Defendants took affirmative acts that created and increased the danger of the school shooting at Oxford High School on November 30, 2021, resulting in the shooting death of several students, including Hana St. Juliana.**

22.     John Doe, a fourteen-year-old tenth grade student at Oxford High School, became part of Defendant Shawn Hopkins's counselor caseload in the fall of 2020, his freshman year.

23.     In the months leading up to the shooting, Doe was known to Oxford teachers, counselors, and administrators for his concerning behavior that indicated psychiatric distress, suicidality, and the possibility of child abuse or neglect, including a depressed mood, disheveled appearance, minimal participation in class, and refusal to complete school assignments.

24.    In early November 2021, Hopkins received an email from Doe's Spanish teacher that Doe seemed "sad."[5]

25.    Hopkins did a check-in with Doe and told him that he was available if Doe needed to talk.

26.    In response, Doe just looked at Hopkins and said, "okay."[6]

27.    On November 11, 2021, Doe brought a severed bird's head to school and placed it in the boys' bathroom.

28.    Other students found and reported the bird's head to school administrators, including Oxford High School Principal Steven Wolf. OCSD administrators concealed this information from staff and parents.

29.    A reasonable investigation would have uncovered that Doe was the student responsible.

30.    A record in Doe's journal confirmed that he was the person who brought the bird head to school. Cell phone records documented that he had recorded himself decapitating a bird.

31.    The next day, November 12, 2021, Oxford High School administration sent an email to parents of Oxford High School students stating: "Please know that

---

[5] Transcript of Preliminary Examination, Vol. 2, *The People of the State of Michigan v. James Robert Crumbley and Jennifer Lyn Crumbley*, (Nos. 21-006651-2; 2022-279989-90-FH) at 108:21–22.
[6] *Id.* at 109:1–7.

we have reviewed every concern shared with us and investigated all information provided . . . We want our parents and students to know that there has been no threat to our building nor our students."

32.    On or about November 16, 2021, multiple parents directly informed Principal Wolf of concerns about threats to students made on social media, and concerns about multiple severed animal heads at Oxford High School.

33.    Communications from parents to Principal Wolf stated, in part: "I know it's been investigated but my kid doesn't feel safe at school . . . He didn't even want to go back to school today."

34.    Students and parents at Oxford High School recognized the presence of a violent threat in mid-November 2021, but OCSD administrators dismissed the threat as not credible.

35.    In response to reports from parents, students, and teachers, District administrators persisted in their campaign to conceal and minimize the potential threat to school safety.

36.    On November 16, 2021, Principal Wolf emailed parents: "I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors."

37.     Also on November 16, 2021, Superintendent Throne made an announcement on the school loudspeaker instructing students to stop spreading and relying on information on social media and reiterating that there were no threats that posed any danger to students at Oxford High School.

38.     Doe's social media accounts were set to allow any member of the public to view them, and the content of his accounts were known to fellow students, parents, and Defendants prior to the shooting.

39.     On November 26, 2021, Doe received a Sig Saur 9 mm semi-automatic handgun as a gift from his father.

40.     On November 26, 2021, Doe posted a picture of the Sig Saur 9 mm semi-automatic handgun to his social media account with the caption: "just got my new beauty today [heart eyes emoji] Sig Saur 9 mm. Any questions I will answer."

41.     Doe posted to Instagram a picture and caption of the Sig Saur 9 mm semi-automatic handgun. This post was for public viewing and accessible to all Defendants.

42.     On November 27, 2021, Doe's mother posted a photo on her social media account with a picture of a target at a shooting range: "mom and son day testing out his new Christmas present." This message referred to Doe firing his handgun. Doe's mother's account was also set to allow public viewing.

43.     The morning of November 29, 2021, Nicholas Ejak, Dean of Students, and Pam Fine, the District's Restorative Practices Coordinator, received an email from Doe's Spanish teacher stating that Doe had been using his phone during class to access the internet and to look up information about bullets.

44.     This email message was forwarded to Doe's counselor, Shawn Hopkins.

45.     Pam Fine called Doe to her office, where he met with Fine and Hopkins.

46.     The meeting started at approximately 9:00 am on November 29, 2021 and lasted approximately five minutes.[7]

47.     The only support or guidance that Fine and Hopkins provided to Doe was to inform him that looking up bullets on his phone during school was not "school appropriate behavior."[8]

48.     In response, Doe told Fine and Hopkins that he had gone to a gun range with his mother the previous weekend to shoot guns, that shooting guns was a family hobby, and that he was researching information about his shooting hobby.

49.     During the meeting, Doe was compliant, calm, and understanding, was not argumentative or oppositional, and demonstrated an obedience to authority.

---

[7] *Prelim. Ex. Tr.*, vol. 2 at 109:1–7.
[8] *Id.* at 110:4.

50.     At the conclusion of the meeting, Fine and Hopkins permitted Doe to return to class.

51.     After the meeting, Fine called Doe's mother and left a voicemail message.

52.     In accordance with the District's policy, Fine did not ask for a return call from Doe's mother because the situation did not present a disciplinary issue.

53.     On November 29, 2021, Doe posted to his public Twitter account: "Now I am become Death, the destroyer of worlds. See you tomorrow Oxford."

54.     The morning of November 30, 2021, at approximately 8:30 am, Hopkins received an email from a teacher in the English department stating that Doe was watching during class a video depicting a shooting on his phone.

55.     At approximately 8:59 am, Doe's math class participated in a test review. On his worksheet, Doe drew a picture of his Sig Sauer 9 mm handgun. Under the gun, he wrote: "The thoughts won't stop. Help me." To the right, he drew a person with two gunshot wounds: one in the chest and one in the abdomen with blood coming from the mouth. Beside this, he wrote "blood everywhere" and drew a shell casing or bullet. Below, Doe drew a laughing/crying emoji. Finally, he wrote: "My life is useless" and "The world is dead." His teacher saw the drawing and immediately reported it to Hopkins and Ejak.

56.     At some point that morning, Doe altered the drawing. He scratched out the drawings of the gun, the bloody figure, and the words "Help me," and, "My life is useless," "The world is dead," and "Blood everywhere." He added new sarcastic phrases which, in context, were also disturbing: "video game this is," "harmless act," "I love my life so much!!!!" "OHS rocks!" and "we're all friends here."

57.     Nicholas Ejak, Dean of Students, came to Hopkins' office around 9:00 am to let Hopkins know that he had seen a picture of the writings and drawings on Doe's math assignment.

58.     Hopkins went to the math classroom to remove Doe for a meeting in the counseling office.

59.     Hopkins took possession of the math assignment off Doe's desk in the math classroom and then escorted him to the counseling office, where Ejak was waiting. His backpack remained in the classroom.

60.     Ejak returned to the math classroom and retrieved Doe's backpack, which contained a handgun and forty-eight rounds of ammunition.

61.     Neither Hopkins nor Ejak searched Doe's backpack or locker to determine whether Doe was armed and dangerous and to determine whether he had immediate access to a deadly weapon he could use to harm himself or others.

62.    In the counseling office, Hopkins asked Doe about the video of a shooting that he had been watching in English class the morning of November 30, 2021.

63.    Doe told Hopkins and Ejak that the video was from a video game.

64.    Neither Hopkins nor Ejak attempted to watch the actual video to confirm its depictions or the accuracy of Doe's response.

65.    Ejak and Hopkins thus had actual knowledge of a safety threat and a concern for Doe's safety and well-being, given the events in the preceding months and specifically on November 29 and 30, 2021, which included: searching for bullets on his phone, informing Hopkins and Fine of his shooting hobby, viewing a shooting video during English class, and drawing disturbing words and images on a paper assignment in math class.

66.    After asking Doe about the video, Hopkins questioned him about the words and images he had drawn on his math assignment ("The thoughts won't stop. Help me . . . blood everywhere . . . My life is useless . . . The world is dead.").

67.    Doe's only explanation for the words and drawings was that it was a drawing of a video game he wanted to design.

68.     Hopkins knew that Doe was not being truthful when Doe dismissed the words and images as a video game design, as demonstrated by the fact that Hopkins told Doe, "this does not sound like a video game."[9]

69.     Doe's demeanor then demonstrably changed and, in Hopkins's words, Doe "became sad . . . He started pausing more in his speech. He then described some [upsetting] things that had happened recently in his life," including the death of a family dog, the death of a grandparent, and the loss of a close friend who had to leave school.[10]

70.     At that point, Hopkins determined that Doe was suicidal.[11]

71.     Hopkins asked Doe if he was a threat to himself or others.

72.     Doe responded, "I can see why this looks bad. I'm not going to do anything."[12]

73.     Hopkins did not accept Doe's response at face value, and Hopkins concluded, accurately, that Doe was suicidal and "was a threat to himself in spite of his statement."[13]

74.     Hopkins called Doe's mother but received no answer and left a voicemail message.

---

[9] *Prelim. Ex. Tr.*, vol. 2 at 116:19–20.
[10] *Id.* at 116:22–117:10.
[11] *Id.* at 117:14–16.
[12] *Id.* at 123:2–3.
[13] *Id.* at 148:4–6.

75.    Hopkins then called Doe's father but received no answer and no option to leave a voicemail.

76.    Doe's mother then returned Hopkins's call.

77.    Hopkins put the call on speaker so that Doe, along with Ejak and Hopkins, could speak with Doe's mother.

78.    Hopkins has stated in court testimony that he was concerned about Doe based on the words and drawings on his math assignment, along with the information gathered in his meeting with Doe that morning.

79.    Hopkins asked Doe's mother to come to school for a meeting.

80.    Doe's mother told Hopkins she was at work and that she would try and get in touch with Doe's father.

81.    Doe's mother called back and said she would be there in a half hour.

82.    At approximately 10:30 am, Doe's mother and father arrived at the school.

83.    While they waited for Doe's parents to arrive, Hopkins stayed with Doe in the counseling office because he knew he was suicidal and that it was not safe to leave him alone.

84.    After Doe's parents arrived, Hopkins texted Ejak to come back to his office for a meeting.

85.     Upon their arrival, Doe's parents did not greet, touch, or hug Doe, and they were not friendly or showing care for their child.

86.     In the meeting with the Doe family, Hopkins described why he was concerned about Doe, including his conclusion that Doe was suicidal and his concern for his well-being.

87.     Hopkins provided the Doe family a list of resources for mental health support and stated that Doe needed to start counseling as soon as possible, "today, if possible," or take other steps to protect their son from self-inflicted harm.

88.     Doe's parents stated that the same day was not possible because they had to return to work.

89.     Hopkins then stated that he wanted Doe seen for mental health counseling within 48 hours, that he would follow up to see if he had obtained counseling, and that if they did not obtain counseling, he would report them to Child Protective Services ("CPS").

90.     Doe's parents refused to take their son home for the day.

91.     Based on the facts and circumstances known to them at the time, Hopkins and Ejak knew that Doe was suicidal.

92.     Hopkins and Ejak also knew, or should have known, that Doe had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others.

93.     At the end of the meeting, Doe's mother then asked Hopkins and Ejak, "are we done?"[14]

94.     Hopkins looked to Ejak and asked him "if there was any disciplinary reason why [the] student could not return to class."[15]

95.     Ejak responded "no."[16]

96.     Hopkins then said, "I guess we are done."[17] Hopkins and Ejak knew that their meeting with Doe's parents worsened Doe's emotional and psychiatric condition.

97.     Hopkins knew from conversation with Doe about the shooting range the day before that Doe had access to firearms.

98.     Both Hopkins and Ejak knew Doe was obsessed with firearms and gun violence; they were both aware that he was searching for bullets and watching shooting videos the day before, and they were both aware of his drawing depicting graphic gun violence.

99.     Hopkins and Ejak knew that because Doe was suicidal, and because the facts established probable cause to know that he posed a threat to himself and others, he should be supervised in a safe setting, and that he should not be left alone.

---

[14] *Prelim. Ex. Tr.*, vol. 2 at 132:2.
[15] *Id.* at 132:5–7.
[16] *Id.* at 132:8–9.
[17] *Id.* at 132:13–14.

100.    Ejak and Hopkins had the authority as school administrators to maintain Doe in a safe, secure and restricted environment in the counseling office, where, based on the assessment that he was suicidal, he was supervised by adults and did not have access to weapons that he could use to harm himself or others.

101.    Instead, Ejak and Hopkins used their authority to return Doe to class, despite knowing that he was suicidal, and that he posed a substantial threat to himself and others.

102.    Hopkins and Ejak misused their authority by sending Doe back through the school to his third period class, alone, with his unsearched backpack containing a handgun and forty-eight rounds of ammunition.

103.    Because Hopkins knew that Doe was suicidal, he used the school's attendance reporting system to remotely track Doe through the day and to see if he had been checked in as "present" for his third and fourth period classes.[18]

104.    Hopkins, despite knowing that Doe was suicidal and was a threat to himself in spite of his statement [to the contrary],"[19] concealed those facts from Doe's teachers as well as the school's liaison police officer, and further concealed both the fact that Doe should not be left alone and the threat he posed to himself and others.

---

[18] *Prelim. Ex. Tr.*, vol. 2 at 134:2–3.
[19] *Id.* at 148:4–6.

105.   Less than two hours after Ejak and Hopkins released Doe from the safety and security of the counseling office, Doe took his backpack into a bathroom and emerged with his loaded handgun.

106.   Doe then opened fire, killing four students, including Hana St. Juliana, and seriously injuring seven others.

107.   The environment before Hopkins and Ejak acted to release Doe to the classroom was a status quo of safety because Doe was safely and securely restricted to the counseling office, under the direct supervision of school administrators, and he did not have access to weapons.

108.   Hopkins and Ejak had the official authority to act as "gatekeepers" in deciding whether to release Doe from the counseling office and return him to the classroom with his backpack.

109.   Hopkins and Ejak used their authority to return Doe to the classroom, causing a departure from the status quo, and thus creating and increasing a risk of violence that had not existed.

110.   These affirmative acts by Hopkins and Ejak, which departed from the status quo of safety, rendered the occupants of Oxford High School – including Hana St. Juliana—more vulnerable to danger than had Hopkins and Ejak not returned Doe from the confines of the counseling office to the classroom.

111.   Moreover, the meetings conducted by Hopkins and Ejak on the morning of November 30, 2021 worsened the situation and affirmatively increased and accelerated the danger of harm at Oxford High School.

112.   The meetings themselves worsened the situation and were a contributing cause-in-fact of the shooting because the meetings placed direct pressure on Doe, who was obviously in a state of suicidal and homicidal ideation, and experiencing a mental health crisis.

113.   Furthermore, the meetings directly subjected Doe to the shame, fear, humiliation, and embarrassment of having his parents ignore, ridicule, and embarrass him in the presence of Hopkins and Ejak, thus increasing the risk of violence upon his release from the counseling office to the school environment. The decision by Ejak and Hopkins to conduct the meeting with Doe's parents in front of Doe was clinically inappropriate and certain to exacerbate Doe's feelings of distress.

114.   Hopkins and Ejak's actions in threatening to call CPS in Doe's presence, and thereby threatening to remove Doe from his home, exacerbated Doe's distress and mistreatment by his parents, and therefore created and increased the danger that Doe would act on his violent ideation after they released him from the counseling office to the school environment.

115.   The action of Hopkins and Ejak to return the unsearched backpack containing the firearm and ammunition to Doe and release him into the school placed

the students and staff at Oxford High School directly in harm's way and provided Doe with the weapon and ammunition he used to commit the deadly shooting.

116.   By giving Doe the unsearched backpack containing the gun and ammunition, and releasing him from the confines of the counseling office and returning him to the classroom and the general school population, Hopkins and Ejak affirmatively set into motion the shooting that ensued, with deliberate indifference to the substantial and obvious threat of a school shooting, and with recklessness demonstrating deliberate indifference and a substantial lack of concern for whether an injury resulted, either to Doe or to the students and staff of Oxford High School.

117.   Hopkins and Ejak affirmatively concealed information by not informing either Doe's teachers or school safety liaison officer of the situation, including the fact that Doe was suicidal, thereby creating and increasing the danger of a violent incident occurring.

118.   It is shocking to the conscience that Hopkins and Ejak would take these actions despite their knowledge that Doe was suicidal and that he was expressing specific violent ideations about gun violence.

119.   The death of Hana St. Juliana was caused by the wrongful affirmative acts and fault of Defendants being sued for damages.

**C. In accordance with its illegal policies, practices, and customs, the District engages in a concerted cover story to deflect responsibility for the Oxford High School Shooting.**

120.    Since the shooting, the Oxford Community School District and its administrators have manufactured a cover story to justify the decision to release Doe from the safety and security of the counseling office, where he was safely supervised and where his movement and actions were restricted, and returned him to class, despite knowing that he was in throes of a mental health crisis, obsessed with guns and gun violence, had access to firearms and was determined to be a threat to himself and others.

121.    Specifically, the District has sought to avoid accountability by claiming it has a formal policy and practice of returning students to class unless there is a "disciplinary" issue that can be used to either send them home or hold them in the counseling office, and since Doe did not present a "disciplinary" issue, it had no choice but to return him to class.

122.    This policy of using false justifications demonstrates egregious deliberate indifference to the danger presented when a student such as Doe, who the school knew was suicidal and presented a clear threat, is returned to the school environment.

123.    To make matters worse, the District has developed a false narrative in its efforts to avoid accountability. On December 2, 2021, Superintendent Throne issued a video message which suggested that Doe had contact with the "front office" before the attack but could not be detained because discipline wasn't warranted.

Throne said, "I want you to know there's been a lot of talk about the student who was apprehended.  That he was called up to office and all that kind of stuff.  No discipline was warranted.  There are no discipline records [for Doe] at the High School.  Yes, this student did have contact with our front office. And yes, his parents were on campus on November 30."

124.   This statement was deliberately misleading because of what it doesn't say. Superintendent Throne knew that on the morning of the shooting, Doe was deemed to be suicidal and then released from the safety and security of the counseling office, where he was safely supervised and where his movement and actions were restricted. Superintendent Throne knew that OCSD staff sent Doe back to class, despite knowing that he was in throes of a mental health crisis, obsessed with guns and gun violence, had access to firearms and was determined by OCSD staff to be a threat to himself and others.

125.   During the week of December 6, 2021, Superintendent Throne wrote a letter to the parents of Oxford High School students. At this point, the narrative became completely contrived. In describing the events of the morning of November 30, when Doe was in the counselor Hopkins's office, the Superintendent stated that at "no time did the counselors believe the student might harm others based on his behavior, responses and demeanor, which appeared calm."  The Superintendent, at the time he made this statement, knew it was false.  The Superintendent went on to

say in the letter that "[w]hile both of his parents were present, counselors asked specific probing questions regarding the potential for self-harm or harm to others. His answers, which were affirmed by his parents during the interview, led counselors to again conclude he did not intend on committing either self-harm or harm to others. The student's parents never advised the school district that he had direct access to a firearm or that they had recently purchased a firearm for him."

126.   Again, the above assertion was false because Counselor Hopkins did in fact determine that Doe was suicidal and Hopkins was fully aware that Doe was experiencing a mental health crisis, was obsessed with guns and gun violence, had access to firearms, and had verbalized a desire to harm others. When the Superintendent made these assertions, he knew they were false.

127.   Near the beginning of the letter the Superintendent states that he "asked for a third-party investigation be conducted so we leave no stone unturned, including any and all interaction the student had with staff and students." At the end of the letter, the Superintendent wrote, "Again, I have personally asked for a third-party review of all the events of the past week because our community and our families deserve a full, transparent accounting of what occurred."

128.   The District has not fulfilled this pledge to the students, parents and the Oxford Community.

129.   Hana St. Juliana is survived by her father, mother, sister, brother and maternal and paternal grandmothers all of whom are entitled to participate in any recovery under Michigan's Wrongful death statute.

130.   Steve St. Juliana, as personal representative of the Estate of Hana St. Juliana, seeks to recover for the estate the following:

a.  All damages permitted by law flowing from Hana St. Juliana's wrongful death.

b.  Unreimbursed medical and hospital expenses, burial and funeral expenses.

c.  Physical and emotional pain and suffering endured by Hana before her death, including loss of enjoyment of life.

d.  Loss of the society and companionship of the deceased experienced by Hana's father, mother, brother, sister and her two grandmothers.

## CAUSES OF ACTION

### COUNT I
### STATE-CREATED DANGER — 42 U.S.C. § 1983
### Estate of Hana St. Juliana vs. Ejak and Hopkins

131.   Plaintiff incorporates by reference all the above allegations.

132.   Hana St. Juliana was a citizen of the United States entitled to all rights, privileges, and immunities accorded to all citizens of the State of Michigan and the United States, including the clearly established right not to be deprived of life without due process of law under the Fourteenth Amendment to the United States Constitution, as enforced pursuant to 42 U.S.C. § 1983.

133.   Any reasonable person would be aware of this clearly established right.

134.   Ejak and Hopkins, with knowledge of this clearly established right, and acting in deliberate indifference, violated Hana St. Juliana's right to not be deprived of life without due process, as secured by Fourteenth Amendment's Due Process Clause, by taking affirmative acts under color of law to disrupt the status quo and create a danger of death that did not exist in the status quo prior to those affirmative state actions, and by taking affirmative acts which caused the death of Hana St. Juliana, which would not have happened but-for those affirmative state actions. At all relevant times, Defendants Ejak and Hopkins were acting under the color of state law as employees of Oxford Community School District, a public school district, including and not limited to securing, supervising, advising, and directing the

activities of Doe; actions and decisions regarding school practices and procedures, both formal and informal; and in their conduct as school administrators and counselors.

135.   Defendants Ejak and Hopkins knew that Doe was suicidal, that he was in extreme emotional distress; that he presented a substantial risk of danger to himself and others at the school; that he was urgently requesting help from school staff; that there was sufficient cause to believe his parents abused and/or neglected him; and that he expressed specific violent intentions involving the use of a firearm.

136.   Ejak and Hopkins had the authority and obligation as school administrators to maintain the status quo, in which Doe was safe, secure and restricted in the counseling office, and where he was supervised by adults and did not have access to weapons that he could use to harm himself or others.

137.   Ejak and Hopkins had the authority to maintain Doe in a safe and secure location under the watchful eye of a responsible adult until such time as he was no longer a threat to himself or to his fellow students.

138.   Ejak and Hopkins affirmatively misused their authority by releasing Doe from the counseling office and returning him to class, despite knowing that he was suicidal, and that he posed a substantial threat to himself and others.

139.   Defendants Ejak and Hopkins each took affirmative actions that individually, or in concert with one another, created and substantially increased the

danger that Doe's conduct would escalate to actual violence, thus causing the death of Hana St. Juliana.

140.   Defendants Ejak and Hopkins took affirmative acts that created or increased the risk of danger, including and not limited to:

a.   Releasing Doe from the safe and secure confines of the counseling office to the general school environment, despite knowing that Doe was suicidal and despite knowing, or having probable cause to know, that he was a threat to himself and others;

b.   Returning the unsearched backpack containing his gun and ammunition to Doe, despite knowing that Doe was suicidal and despite knowing, or having probable cause to know, that he was a threat to himself and others;

c.   Promoting a policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation of suspected or known risks of school violence; and

d.   Any and all additional affirmative acts that created or increased the danger of violence at the school that may become known throughout the course of this litigation.

141. Defendants Ejak and Hopkins's affirmative acts created and exacerbated a state-created danger that substantially increased the special danger of

harm to Hana St. Juliana and her classmates at the school, and in doing so knowingly and recklessly disregarding the substantial risk of danger that Doe posed to himself and others.

142.   The relationship between Hopkins and Ejak, as school administrators, and the students of Oxford High School, including Hana St. Juliana, was such that Hopkins and Ejak knew that Hana St. Juliana was a foreseeable victim of Doe's acts of violence following his release from the security of the counseling office by Hopkins and Ejak.

143.   Hopkins and Ejak are not entitled to qualified immunity because Plaintiff's right to not be killed by a fellow student who was released from a safe environment into one in which harm was likely to occur was clearly established at the time of Hopkins and Ejak's actions

144.   The conduct of Defendants Ejak and Hopkins was objectively unreasonable and performed knowingly, deliberately and with deliberate indifference to the safety of Hana St. Juliana and her classmates, causing Oxford High School students and staff to be less safe than they were before Defendants' affirmative actions.

145.   Defendants Ejak and Hopkins knew that their conduct, which exacerbated the risk and ultimately caused a school shooting, violated the clearly established rights of the students at Oxford High School.

146.   Hopkins and Ejak had ample time to deliberate and make an unhurried judgment about whether to release Doe—who they knew was suicidal and posed a threat to himself and others—from the safety and security of the counseling office to the school environment.

147.   Hopkins and Ejak consciously disregarded a substantial risk of serious harm by releasing Doe—who they knew was suicidal and posed a threat to himself and others—from the safety and security of the counseling office to the school environment.

148.   But for the affirmative acts of Hopkins and Ejak to change the status quo by permitting Doe to leave the counseling office with the backpack containing his handgun and bullets, Doe would not have shot, injured, or killed anyone at Oxford High School, including Hana St. Juliana, on November 30, 2021.

149.   But for Hopkins's and Ejak's actions of releasing Doe into the school environment with the backpack containing his handgun and bullets, the status quo – safety – would have remained.

150.   Hopkins's and Ejak's actions thus affirmatively created new dangers that did not exist as long as Doe remained in the counseling office, separated from his backpack, and affirmatively increased dangers that did not exist as long as the status quo was preserved.

151.   It is shocking to the conscience that Hopkins and Ejak would release Doe  from the security of the counseling office and return him to the classroom, where they knew that Doe  was suicidal, they knew that Doe had an obsession with guns and gun violence, they knew that Doe had been researching bullets at school and informed Hopkins that he enjoyed shooting guns, they knew that Doe had been watching a video of a shooting in his first hour class, they knew that in his second hour class Doe had drawn disturbing and violent words and images onto a paper assignment, including: "The thoughts won't stop. Help me…blood everywhere…My life is useless… The world is dead;" they knew that Doe's parents were informed of his suicidal ideation and abandoned him at school,  they knew that Doe was a threat to himself and others, even after he denied that he was a threat when Hopkins posed that direct question to Doe, and  they knew that they had an obligation to keep Doe away from the classroom environment even if the circumstances did not present a "disciplinary issue."

152.   In comparison with the public-at-large, as students of Oxford High School, Hana St. Juliana and the other victims of the shooting were specifically at risk and exposed to the dangers presented by the act of releasing Doe  from the safety of the counseling office to the school environment, where he committed the shooting.

## COUNT II
### STATE-CREATED DANGER — *MONELL* LIABILITY UNDER 42 U.S.C. § 1983
### Estate of Hana St. Juliana vs. Oxford Community School District

153.   Plaintiff incorporates by reference all the above allegations.

154.   Defendant Oxford Community School District and its administrators and policymakers, including Superintendent Throne, Principal Wolf, and Dean of Students Ejak, adopted and maintained official policies, practices, and customs that were the moving force behind, and cause-in-fact of, the school shooting and the death of Hana St. Juliana on November 30, 2021. These official policies, practices, and customs included and are not limited to:

  a.   An official policy, practice, and custom of preventing staff and administrators from maintaining administrative supervision over students in the counseling office, and restricting students from returning to the classroom, unless there is a "disciplinary issue" to justify doing so.

  b.   A policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

  c.   The District did not train Hopkins and Ejak to secure or hold a student in the counseling office, or to otherwise restrict a student

from returning to the classroom, where the student is suicidal, where the student presents a threat of harm to themselves or others, and where returning the suicidal student to the classroom environment would create or increase the danger of deadly violence.

d.  A policy, practice, and custom of not training staff or administrators in the proper manner of interviewing and questioning a student who is known to be suicidal, including and not limited to questions about whether the student has a deadly weapon, including a firearm, and whether the student has access to a deadly weapon, including a firearm;

e.  A policy, practice, and custom of not training staff or administrators in in proper methods for completing a risk assessment;

f.  Disregarding and diverting student mental health crises if they do not fit within the District's definition of a "disciplinary" issue;

g.  Declining to file mandatory reports of suspected child abuse or neglect in violation of MCL § 722.623(a);

h.  Discouraging teachers, counselors, and administrators from reporting suspected child abuse or neglect, despite their status as mandatory reporters;

i.  Requiring additional and unnecessary procedures in order to approve a teacher, counselor, or administrator's request to file a report of suspected child abuse or neglect, or to contact law enforcement regarding a threat of violence at school;

j.  Adopting and maintaining inadequate and improper search policies; and

k.  Any other policy, practice, or custom that may become known through the course of this litigation.

155.   These policies, practices, and customs caused employees to inflict constitutional harms by directly causing the escalation that led to the deadly shooting and deprivation of life of Hana St. Juliana on November 30, 2021.

## COUNT III
**PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF**
**14TH AMENDMENT DUE PROCESS AND 42 U.S.C. § 1983**
**Plaintiff Reina St. Juliana vs. Defendant Ken Weaver**

156.   Plaintiff Reina St. Juliana incorporates all the foregoing allegations by reference.

157.   Plaintiff Reina St. Juliana is the older sister of Hana St. Juliana.

158.   Reina St. Juliana is currently sixteen years old and is a junior at Oxford High School and proceeds through her Next Friend and father, Steve St. Juliana.

159.   The Fourteenth Amendment to the United States Constitution forbids state actors from depriving any person of life, liberty, or property without due process of law.

160.   Based on the provisions of Michigan law regarding public education, the students of Oxford Community School District, including Plaintiff Reina St. Juliana, have a Constitutionally protected right to a public education, which is protected as a property interest  under the Due Process Clause of the Fourteenth Amendment.

161.   Defendants Oxford Community School District and Weaver must exercise their authority in the operations of the District consistent with constitutional safeguards.

162.   As alleged in this Complaint, Defendants took affirmative state actions that, in accordance with official District policy, created the danger of deadly violence at Oxford High School, and which in fact caused the shooting at Oxford High School on November 30, 2021.

163.   Oxford High School remained closed, and its surviving students including Reina St. Juliana were completely deprived of their right to a public education, from November 30, 2021 until January 24, 2022.

164.   Since Oxford High School reopened on January 24, 2022, the District, as well as then-superintendent Throne and current superintendent Weaver, have

failed to remedy the unconstitutional policies and customs that caused the shooting to occur, and have therefore deprived the surviving students, including Reina St. Juliana, of the full and equal enjoyment of their property right to a public education.

165.   Yet, to date, the District has not undertaken any measures to restore the property right of OHS students, including Reina St. Juliana, to the full enjoyment of a public education at OHS.

166.   The District's failure to restore the full property interest of students to a public education include, and are not limited to:

    a.  After the shooting, through then-superintendent Throne, the District promised it would complete a thorough and independent investigation to review its actions and the events leading to the shooting. To date, the District has not even started the investigation it promised.

    b.  The District maintains its unconstitutional policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, the District will continue to place suicidal students in the classroom even where they pose a threat to themselves and others,

as happened when Doe was released from the counseling office to the classroom on November 30, 2021.

c. The District maintains a policy of failing to train administrators that they can restrict suicidal students from returning to the classroom.

d. The District maintains a policy of failing to train administrators in how to complete a thorough and effective risk assessment for suicidal students.

e. Since the shooting, the District has engaged in a concerted cover story of its actions leading to the shooting. This includes, and is not limited to, asserting in court proceedings and in the media that it properly returned Doe to the classroom on November 30, 2021, despite knowing he was suicidal, because his case did not present a "disciplinary issue" that would warrant keeping him in the counseling office that day.

167. To redress and remedy these unconstitutional practices, Plaintiff Reina St. Juliana requests the following prospective equitable and injunctive relief:

a. An order requiring the District and/or Superintendent Weaver to immediately begin an independent investigation of the actions and events leading to the school shooting on November 30, 2021.

b. An order requiring the District and/or Superintendent Weaver to immediately cease its policy, practice, or custom of concealment,

misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c.  An order requiring the District and/or Superintendent Weaver to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, the District will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when Doe  was released from the counseling office to the classroom on November 30, 2021.

d.  An order requiring the District and/or Superintendent Weaver to secure proper training for administrators to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others.

e. An order requiring the District and/or Superintendent Weaver to secure proper training for administrators in how to conduct a proper risk assessment when students are suicidal;

f. An order requiring the District and/or Superintendent Weaver to secure proper training for administrators to ask students and family members whether a student owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

g. An order requiring the District and/or Superintendent Weaver to secure proper training for administrators and other staff of when and how to conduct a legal search of student belongings, including backpacks and lockers;

h. An order requiring the District and/or Superintendent Weaver to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that Hopkins and Ejak acted properly in releasing Doe from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

i. All other prospective equitable and injunctive relief the Court deems necessary to restore Plaintiff's property right to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT IV
### GROSS NEGLIGENCE
### Estate of Hana St. Juliana vs. Throne, Wolf, Ejak, and Hopkins

168. Plaintiff Steve St. Juliana incorporates by reference all the above allegations.

169. "Defendants" as used in this Count means Throne, Wolf, Ejak and Hopkins.

170. "Gross negligence" means a duty and breach of that duty by conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results, causing injury. MCL § 691.1407(2).

171. Defendants had a duty to refrain from taking actions that were so reckless as to demonstrate a substantial lack of concern for whether an injury results, thereby causing injury.

172. In deliberate breach of his duty, Defendant Throne concealed, minimized, and downplayed the known risk of harm inside of Oxford High School, and affirmatively discouraged students, parents, teachers, and administrators from reporting or taking action to alleviate the risk of deadly violence at the school.

173.     Defendants Hopkins, Ejak, Wolf, and Throne were aware of multiple "red flags" alerting them to the danger that John Doe presented in the school environment, and John Doe himself cried out for help on multiple occasions, yet, in deliberate breach of their duty, Defendants Hopkins, Ejak, Wolf, and Throne failed to intervene on any of the multiple occasions when doing so would have allowed John Doe to obtain the help that he needed and prevented the shooting that occurred on November 30, 2021.

174.     In deliberate breach of his duty, Defendant Wolf concealed, minimized, and downplayed the known risk of harm inside of Oxford High School, and affirmatively discouraged students, parents, teachers, and administrators from reporting or taking action to alleviate the risk of deadly violence at the school.

175.     In deliberate breach of their duty, Defendants Hopkins and Ejack released Doe from the safety and security of the counseling office *after* they determined that he was suicidal, and without taking any precautions, including searching his backpack or locker, or informing his teachers of his suicidal state, thus placing Hana St. Juliana and the other victims directly in harm's way.

176.     All of these breaches of duty were so reckless as to demonstrate a substantial lack of concern for whether an injury would result, and these breaches were the cause of the shooting itself.

177.    When a child such as Doe is known to his counselor and dean of students to be suicidal, and expresses repeated cries for help at school to his teachers and counselors regarding acute psychiatric distress and violent ideation related to firearms, as well as indicators of child abuse and neglect, it is entirely foreseeable that disregarding the child's requests for help and returning the child to the general student population, while choosing to forego psychiatric support and declining to conduct a search to confirm whether he was armed, is extremely likely to result in a school shooting.

178.    Defendants breached their duty of care because, despite having adequate reason to know that Doe was suicidal, that he presented a threat to himself and others, that he had access to a gun and shot guns as a hobby, that he had been searching for bullets online during school in the past 24 hours, that on the morning of November 30 he had been watching a video of a shooting (to the point that his English teacher raised the issue to school administration), and had drawn violent and threatening words and images on a paper assignment (causing his math teacher to raise the issue to administration), neither Hopkins nor Ejak searched Doe's backpack or locker, even though searching the backpack and locker was absolutely necessary, under all the surrounding circumstances, to ensure that Doe was not armed and dangerous and to determine whether he had immediate access to a deadly weapon he could use to harm himself or others

179.   Defendants' actions—including and not limited to their inadequate and dangerous policies and practices, their affirmative decisions to exclude Child Protective Services and law enforcement, their repeated decisions to keep Doe in school and in class, even after determining he was suicidal, and the final deadly decision to return the backpack to Doe after choosing not to conduct a search—was so reckless as to demonstrate a substantial lack of concern for whether an injury resulted, and therefore breached their duty of care.

180.   Defendants' acts and omissions were grossly negligent, and were the proximate cause of Hana St. Juliana's injuries because Defendants' acts and omissions directly placed the shooting victims in harm's way, provided Doe with access to the weapons he used to kill Hana St. Juliana and to kill and injure others, and caused Doe to escalate his behavior from violent ideation to violent conduct.

181.   As a direct and proximate result of Defendants' actions, Hana St. Juliana suffered a wrongful death and her estate is entitled to recovery as alleged above.

## RELIEF REQUESTED

182.   Accordingly, Plaintiffs respectfully request this Honorable Court grant the following relief in accordance with 42 U.S.C. § 1983, MCL § 722.621, and Michigan common law:

(a)    An award of actual and punitive or exemplary damages recoverable under Michigan's Wrongful Death Statute;

(b)    An award of damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the physical and emotional pain and suffering, while conscious, undergone by Hana St. Juliana during the period intervening between the time of the injury and death;

(c)    An award of damages for the loss of the society and companionship of the deceased;

(d)    On behalf of Plaintiff Reina St. Juliana, an order of all prospective equitable and injunctive relief described in Count III of this Complaint;

(e)    An award of actual attorney fees and costs; and

(f)    Any further legal and/or relief that the Court and/or Jury deems equitable or just,

Respectfully submitted,

Pitt, McGehee, Palmer, Bonanni & Rivers PC

By: */s/Michael L. Pitt*
Michael L. Pitt (P24429)
Beth Rivers (P 33614)
Megan Bonanni (P52079)
Kevin Carlson (P67704)
Danielle Canepa (P82237)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

Dated: April 14, 2022

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Steve St. Juliana, personal representative
of the estate of Hana St. Juliana, deceased,
and Reina St. Juliana, a minor,
by her Next Friend Steve St. Juliana,                    Case No.

      Plaintiffs,

                                          U.S. District Judge
                                          U.S. Magistrate Judge
v.

Oxford Community School District,
Timothy Throne, former superintendent,
Nicholas Ejak, Dean of Students,
Shawn Hopkins, Student Counselor,
Kenneth Weaver, Superintendent,
in his official capacity,

      Defendants.

---

## DEMAND FOR JURY TRIAL

Plaintiffs, through their attorneys, Pitt McGehee Palmer Bonanni & Rivers,

P.C., hereby demand a trial by jury of all issues in the within cause of action.

Pitt, McGehee, Palmer, Bonanni & Rivers PC

By: */s/Michael L. Pitt*
Michael L. Pitt (P24429)
Beth Rivers (P 33614)
Megan Bonanni (P52079)
Kevin Carlson (P67704)
Danielle Canepa (P82237)
Attorneys for Plaintiffs
117 W. Fourth Street, Suite 200
Royal Oak, Michigan 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

Dated: April 14, 2022